## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE, AT NASHVILLE

| | | |
|---|---|---|
| PAUL SHANE GARRETT | ) | |
| | ) | |
| **Plaintiff,** | ) | No. _____ |
| | ) | |
| v. | ) | **JURY TRIAL REQUESTED** |
| | ) | |
| Metropolitan Government | ) | |
| of Nashville, | ) | |
| Roy Dunaway, Individually, | ) | |
| E.J. Bernard, Individually, | ) | |
| Jeff West, Individually, | ) | |
| Dean Haney, Individually, and | ) | |
| David Miller, Individually, | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Paul Shane Garrett, through counsel, and for cause of action against these Defendants, respectfully states as follows.

## INTRODUCTION

1.      This is a civil rights action brought pursuant to 42 U.S.C. Section 1983 for the unconstitutional conviction and incarceration of Plaintiff Paul Shane Garrett, who spent 10 years and 4 months imprisoned for the murder of Velma Tharpe—a murder which he did not commit. As a result of the Defendants' unconstitutional acts and omissions, including their (i) failure to disclose exculpatory evidence on multiple occasions; (ii) fabrication of evidence, including the fabrication of a confession by Mr. Garrett when he had consistently asserted his innocence; and (iii) failure to intervene to prevent such constitutional violations, Mr. Garrett was wrongfully arrested, prosecuted, and coerced into accepting a guilty plea and being convicted for Ms. Tharpe's murder for a total of 18 years.

1

2.	In June of 2000, Ms. Velma Tharpe was found deceased, lying in a North Nashville alley, with her clothes disheveled and what appeared to be semen on several parts of her exposed body.  Ms. Tharpe worked in the sex trade, and an autopsy revealed that her cause of death was blunt force trauma to her head and neck.  There were no witnesses to the crime, and none have since been identified.

3.	Over a year after Ms. Tharpe's death, Detective Roy Dunaway and other members of the Metro Nashville Police Department ("MNPD") brought Mr. Garrett, a 28-year-old tow truck driver, in for questioning.   From August 8, 2001, to August 14, 2001, over the course of several separate interrogations, Roy Dunaway, then a detective at MNPD, interrogated Mr. Garrett using coercive, deceptive, and manipulative techniques to try and extract a false confession from Mr. Garrett.  Over the course of these interrogations, and in another conversation with his wife that was secretly recorded by Detective Dunaway, Mr. Garrett explicitly denied murdering Ms. Tharpe nearly 50 times; offered to take a polygraph examination 8 times; and encouraged a comparison of his blood sample to the DNA found on the victim 8 different times.

4.	Despite Mr. Garrett's numerous denials and the absence of any credible proof connecting him to Ms. Tharpe's murder, Detective Dunaway, Detective E.J. Bernard, and the MNPD fabricated evidence to pin the murder on Mr. Garrett, to obtain an indictment against him for first degree murder, and to coerce him into a guilty plea.  The Detectives fabricated a confession after their repeated lies and tactics failed to illicit one from Mr. Garrett.  They then relied upon this fabricated confession and other fabricated evidence, internally and externally, including to obtain a warrant for Mr. Garrett's arrest.  Then, at Mr. Garrett's preliminary hearing on August 30, 2001, Defendant Dunaway falsely testified under oath that Mr. Garrett had repeatedly confessed to Ms. Tharpe's murder and that he had provided other chilling details regarding his involvement in

2

the crime.  This was false.

5.     Just days after Mr. Garrett was indicted based upon fabricated evidence and Detective Dunaway's false testimony, the Tennessee Bureau of Investigation provided the MNPD with DNA testing results from samples collected from Ms. Tharpe's body.  Each of these testing results conclusively *excluded* Mr. Garrett from being the donor.  Subsequent testing results also excluded Mr. Garrett.  But this made no difference to the Nashville District Attorney's Office and the MNPD, both of which continued to rely upon fabricated evidence even after Mr. Garrett –  who had at that point been in jail for nearly a year and a half – ultimately accepted a plea agreement to avoid the risks of a harsher sentence.  Indeed, the Nashville District Attorney's Office and the MNPD continued to bolster their case with additional false proof, including statements from unreliable jailhouse "informants," that the District Attorney's Office concluded it could not introduce at trial.

6.     At the time of the guilty plea, Mr. Garrett had been wrongly led to believe that there was a mountain of credible evidence stacking up against him and that he risked facing the death penalty or life in prison if he proceeded to trial.   As a result of this fabricated evidence and the withholding of exculpatory evidence, Mr. Garrett was coerced into accepting a guilty plea for voluntary manslaughter in exchange for a reduced sentence of 15 years in prison.

7.     Throughout the Tharpe investigation and even beyond Mr. Garrett's conviction, it has been evident that Mr. Garrett did not confess to the crime; that there was no DNA evidence linking him to it; and that there was no physical evidence or credible witnesses linking him to it.  Rather, there was ample DNA evidence from the scene identifying Ms. Tharpe's murderer as a third-party.  There were also hours of audio recordings from the interrogations of Mr. Garrett (which were not disclosed to him prior to January of 2021) which confirmed that Mr. Garrett *never*

3

confessed to Ms. Tharpe's murder.

8.     In August of 2021, 18 years after he had been convicted, Mr. Garrett's conviction was officially overturned and vacated.  As a result of Mr. Garrett's wrongful conviction and the unconstitutional acts and omissions of the Defendants described herein, Mr. Garrett has suffered incalculable losses and damages, including spending 10 years and 4 months in prison; losing years with his family and friends, including his young son, who was only five years old when he was arrested; losing the opportunity to build a career; and being wrongfully burdened with the reputation and public scorn of being a "murderer."

## JURISDICTION AND VENUE

9.     This cause of action arises out of events which occurred involving Paul Shane Garrett and members of the MNPD and Metropolitan Government of Nashville in Nashville, Davidson County, Tennessee.

10.     Venue is proper within this Court pursuant to 28 U.S.C. § 1391, because all the acts or omissions that give rise to the causes of action occurred within this district, and based on information and belief, all the Defendants were residents of this district at relevant times.

11.     Jurisdiction is proper in this Court pursuant to federal question jurisdiction, 28 U.S.C. §§ 1331 and 1343, based on the claims brought under 42 U.S.C. § 1983, 42 U.S.C. § 1988, and the Fourth, Sixth, and Fourteenth Amendments to the Constitution of the United States of America.  Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. § 1367.  All the wrongs complained of herein occurred within this jurisdiction.

12.     Plaintiff's claims under 42 U.S.C. § 1983 and state law arise, among other things, out of the constitutional violations against Mr. Garrett in the manner generally described herein,

4

which deprived him of his clearly established rights guaranteed to him under the Constitution and the laws of the United States and the State of Tennessee. Defendants violated the rights of Mr. Garrett under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution when, as detailed herein, they engaged in the wrongful conduct described herein knowingly and with objective unreasonableness and deliberate indifference to Mr. Garrett's constitutional rights, including his right to a fair trial, to be free from having false evidence presented against him, to the disclosure of exculpatory evidence, and to be free from arrest without probable cause.

13.     Each act of the Individual Defendants was performed under the color of state law and by virtue of the constitutions, statutes, ordinances, regulations, customs and usages of the United States of America, the State of Tennessee, the County of Davidson, and the City of Nashville, and under the authority of their positions as law enforcement officers and/or detectives for such state and county.

14.     The wrongful and unconstitutional conduct described herein was the proximate and legal cause of the serious damages and losses sustained by Mr. Garrett, including his wrongful conviction and loss of liberty.

15.     On August 2, 2021, the Criminal Court for Davidson County, Tennessee granted Mr. Garrett's Petition for Post-Conviction Relief, rendering his conviction void and vacating it. *See* Order Granting Post-Conviction Relief, **Exhibit A**. Accordingly, Mr. Garrett's claims are being timely filed within the statute of limitations. As the Supreme Court has made clear, a "1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994); *Harrison v. Michigan*, 722 F.3d 768, 772-73 (6th Cir. 2013).

5

## PARTIES

16.     Plaintiff Paul Shane Garrett is a resident and citizen of the state of Tennessee.

17.     At relevant times, Defendants Roy Dunaway, Jeff West, Dean Haney, David Miller, and E.J. Bernard (collectively "MNPD Individual Defendants") were detectives and/or officers with the Metro Nashville Police Department and participated in the investigation of Ms. Tharpe's murder.   Each of these defendants are sued in their individual capacities.

18.     On information and belief, Mr. Dunaway may be served with process as set forth in the Summons and in accordance with Rule 4 in Murray, KY.

19.     On information and belief, Mr. West may be served with process as set forth in the Summons and in accordance with Rule 4 in Goodlettsville, TN .

20.     On information and belief, Mr. Haney may be served with process as set forth in the Summons and in accordance with Rule 4 in Goodlettsville, TN.

21.     On information and belief, Mr. Bernard may be served with process as set forth in the Summons and in accordance with Rule 4 in Kingston Springs, TN.

22.     On information and belief, Mr. Miller may be served with process as set forth in the Summons and in accordance with Rule 4 in Smithville, TN.

23.     Defendant Metropolitan Government of Nashville, is a government entity organized under the laws of the State of Tennessee and is located in Davidson County, Tennessee. Among its other functions, Defendant Metro Nashville operates and maintains a law enforcement agency, Metropolitan Nashville Police Department ("MNPD") and a district attorney's office. Defendant Metro Nashville is responsible for ensuring the establishment and enforcement of rules, regulations, policies, procedures, and customs for the MNPD, including those pertaining to the training, supervision, and discipline of law enforcement detectives and officers.  Defendant Metro

6

Nashville may be served through their authorized agents in Nashville, TN.

24. The MNPD Individual Defendants were, at all material times, acting under color of state law and proximately caused the deprivation of Mr. Garrett's federally protected and state law rights.

## FACTS[1]

**The Murder of Velma Tharpe**

25. Early in the morning on June 15, 2000, Velma Tharpe was found deceased in the grass alley behind 1209 Meharry Boulevard in Nashville, Tennessee.

26. Ms. Tharpe was found lying on her back with her breasts partially exposed; she was unclothed from the waist down, and her shorts and underwear were lying nearby. Her white shorts were visibly stained.

27. Detective Roy Dunaway, of the MNPD Murder Squad, arrived on the scene that morning at 7:55 a.m.

28. Officers took photos of the scene, collected physical evidence, and bagged Ms. Tharpe's hands to preserve any evidence on them and under her fingernails.

29. When an autopsy was performed, the examiner determined that Ms. Tharpe had suffered fatal blunt force trauma to the head and neck. Her injuries suggested that she had been strangled.

30. Fluid samples were collected from several locations on Ms. Tharpe's face, body, and clothing.

---

[1] The factual allegations contained in this Complaint are based in part on recorded police interviews only recently made available, as well as transcripts of testimony given during Mr. Garrett's preliminary hearing, and the materials submitted to and the findings of the Criminal Court in Mr. Garrett's 2021 post-conviction proceedings.

31.     Among other DNA evidence, there was undisturbed semen on Ms. Tharpe's body, indicating that the semen was from the last person who came in contact with her – the same person who likely raped and murdered her.

Seven DNA samples were collected from stained areas on Ms. Tharpe's clothes.

**The Investigation and Wrongful Arrest of Paul Shane Garrett**

32.     At the time of Ms. Tharpe's death, Paul Shane Garrett was 28 years old.  He was married with one five-year-old son and another child on the way and worked as a tow truck driver, driving a red wrecker.

33.     Mr. Garrett became the target of the Tharpe investigation in the summer of 2001 only after being "identified" by a female prostitute, Maria Swift, in an unrelated alleged crime. Ms. Swift was not a witness to the Tharpe murder.

34.     There were no witnesses who placed Mr. Garrett at the scene of Ms. Tharpe's murder.

<u>Mr. Garrett's First Interrogation</u>

35.     More than a year later, on August 8, 2001, Detective Dunaway and Detective West of the MNPD brought Mr. Garrett in for questioning.  This was the first of several recorded police interrogations.

36.     Mr. Garrett also voluntarily provided a blood sample and immediately asked to take a polygraph examination.

37.     During each of these interrogations, Mr. Garrett continuously denied killing Ms. Tharpe.

38.     During the first interrogation, Detectives Dunaway and West knowingly and intentionally lied to Mr. Garrett, stating that several witnesses placed Mr. Garrett's red wrecker at

the scene of the murder. There was no factual basis, however, for this statement. Instead, the detectives had lied to try to elicit an incriminating statement from Mr. Garrett.

39. When Mr. Garrett heard this lie from the detectives, he was astonished, said that he'd get a lawyer, and repeatedly denied that he'd killed anyone. Before Mr. Garrett left the room that day, Detective Dunaway stated to Mr. Garrett, "you are going to end up f***** yourself."

Mr. Garrett's Second Interrogation

40. A few days later, on August 12, 2001, Detectives Dunaway and Haney interrogated Mr. Garrett for a second time. This conversation focused on whether Mr. Garrett had ever picked up sex workers while driving his tow truck and whether he used condoms.

41. No specific times, descriptions, or names were referenced by anyone during this interview.

42. Mr. Garrett again offered to take a polygraph examination to prove his innocence.

43. During the second interrogation, Mr. Garrett again denied murdering or assaulting Ms. Tharpe.

44. Based on the coerced identification of Mr. Garrett by Maria Swift (described further below), MNPD arrested Mr. Garrett on August 12, 2001.

45. Mr. Garrett's wrongful incarceration began at that time and continued for more than a decade.

Mr. Garrett's Third Interrogation

46. A third interrogation occurred on August 13, 2001, the day after Mr. Garrett's arrest. Mr. Garrett again denied killing Ms. Tharpe and reiterated that the detectives could check his DNA.

9

47.     During this third interrogation, Detectives Dunaway and West presented Mr. Garrett with several photographs for identification.

48.     There is no record of what pictures the detectives referred to during this interrogation, as they failed to report any identifications or notes in the investigative file.

49.     Around this same time, a second warrant was obtained for Mr. Garrett to be arrested in the Tharpe case.  This arrest warrant, which was written by Detective Dunaway, falsely stated that Mr. Garrett "gave statements implicating himself in the homicide" and that he "identified a photograph of the victim and stated that he had sex with her and choked her."  The officers, however, had knowingly and intentionally provided this false information to obtain the warrant for Mr. Garrett's arrest in the Tharpe case.

Mr. Garrett's Polygraph Examination

50.     Around this same time, Mr. Garrett again offered to take a polygraph examination.

51.     This polygraph examination was administered on August 13, 2001, by Detective Bernard, with Detective Dunaway present.

52.     According to Detective Bernard's one-page report, Mr. Garrett gave a pre-test interview that allegedly showed deceptive results.  However, the pre-test interview and the examination charts were neither recorded nor placed in the police file.

53.     Detectives Dunaway and Bernard also claimed there was an unrecorded meeting outside the polygraph room.  They claimed that during this meeting was when they informed Mr. Garrett that in their opinion, he had given deceptive results.  Detective Dunaway said that he, Detective Bernard, and Mr. Garrett went upstairs afterward and talked about the same stuff again in the recorded interview.

54. In his polygraph report, Detective Bernard falsely stated that Mr. Garrett had made inculpatory statements, including that he "has a problem"; that he likes to choke women; and that the summer before, he had picked up Ms. Tharpe, paid her for sex, and that while having sex, he choked her causing her to begin shaking like she was having a seizure.

55. In this report, Detective Bernard also falsely stated that Mr. Garrett had admitted that he "has choked other prostitutes."

56. None of these "confessions" or other incriminating statements were recorded or true.

Defendants Take Mr. Garrett on an Unrecorded Excursion Around Nashville.

57. That same day, before a fourth recorded interrogation, Detective Dunaway and Detective E.J. Bernard removed Mr. Garrett from jail and drove him around North Nashville. The detectives did not record or document anything about that excursion.

58. During this drive, however, Defendants Dunaway and Bernard falsely reported that Mr. Garrett had again made inculpatory statements concerning Ms. Tharpe's death. They also claimed that Mr. Garrett had pointed out where Ms. Tharpe's body was found.

59. Aside from the detectives' testimony, there was no evidence supporting any of these claims.

Mr. Garrett's Fourth Interrogation

60. Later that day, police interrogated Mr. Garrett for a fourth time; this interrogation was recorded. Mr. Garrett continued to deny his involvement in Ms. Tharpe's murder.

61. Entirely as a result of the detectives' misleading tactics, Mr. Garrett said that he may have had sex with the victim in the past.

11

62.     In response, Detective Dunaway stated, "you choked her." Mr. Garrett denied this allegation.

63.     Detective Dunaway then stated, "[y]esterday, you told us she had a seizure." Mr. Garrett also denied this.

64.     Throughout this interrogation, Mr. Garrett was adamant that during their single possible encounter, if any, he had not choked Ms. Tharpe.

<u>Mr. Garrett Maintains his Innocence During a Recorded Conversation with His Wife</u>

65.     On August 14, 2001, Detective Dunaway secretly recorded Mr. Garrett speaking with his wife at the police station.

66.     Before Mr. Garrett spoke with his wife, Detective Dunaway told Mr. Garrett, "Nothing in this room is recorded . . . speak truth to her."

67.     Detective Dunaway intended to record this conversation and purposefully lied to Mr. Garrett.  The conversation was recorded.

68.     During his conversation with his wife, Mr. Garrett stated that the detectives had told him his DNA was found on the victim.  Mr. Garrett stated, however, that he had no idea how that could be true.  Mr. Garrett told his wife, "[t]hey said it did, I don't know.  They couldn't tell me for sure, I don't know . . . . They showed me a picture . . . but I can't 100% swear that was the lady I was with."

69.     In the conversation with his wife, Mr. Garrett again denied harming Ms. Tharpe.

70.     In the conversation with his wife, Mr. Garrett also expressed a sincere belief that Detective Dunaway was going to help him and that Detective Dunaway knew that he did not murder anyone.

12

<u>Mr. Garrett's Final Interrogation</u>

71.     On August 14, 2001, Detectives Dunaway and Bernard interrogated Mr. Garrett for a final time.

72.     During this final interrogation, the detectives, again, purposefully used coercive tactics to try to elicit an incriminating statement from Mr. Garrett.

73.     Among other things, Detective Bernard asked if Mr. Garrett believed in God so that if a jury were to watch the tape, the jury would know he was not a "monster."  Detective Bernard also said that if Garrett did not believe in God, then they had nothing to talk about.

74.     During this final interrogation, Detective Bernard made clear that he and Detective Dunaway were certain that Mr. Garrett had killed Ms. Tharpe.  Detective Bernard initially suggested that he was willing to "give [Mr. Garrett] the benefit of the doubt" as to whether he killed her intentionally, but later told Mr. Garrett that he believed he had committed a slew of other assaults and homicides.

75.     During this final interrogation, Detective Bernard told Mr. Garrett:

You don't remember everything that you've done. You don't remember, we've gone through this . . . But, you *do* remember, because it's right there, right now, on how many died.  Now what I want you to do is tell us.  And I don't expect you to remember the dates and time.  You choked these women.  You choked them!  You choked them and they died! . . . You have to answer to that.  Now, God is not here, you have to answer to God at some point.

76.     Throughout the course of this final interrogation, Mr. Garrett again denied killing Ms. Tharpe—or anyone else.

77.     In total, Mr. Garrett denied killing Ms. Tharpe nearly 30 times.

78.     On six occasions during this interrogation, the detectives implored him to tell the truth because "jurors will be watching this tape" at his trial and he can best help himself by admitting what he has done to everyone, including God.

13

79.     The detectives repeatedly claimed that Mr. Garrett had changed his story or said something different during a prior statement.

80.     When Mr. Garrett refused to agree to the detectives' narrative, the Detectives described him as a "jerk."

81.     Both detectives told Mr. Garrett, "You are lying," before listing the punishments that Mr. Garrett was facing, including the death penalty.

Mr. Garrett Continuously Denies the Accusations Against Him

82.     Across several interrogations, including the conversation with his wife that Mr. Garrett believed was private, Mr. Garrett offered a total of eight times to take a polygraph examination and for his blood sample to be compared to the DNA retrieved at the scene.

83.     In total, across the six recordings, Mr. Garrett denied committing any murder nearly 50 times.

84.     At no time did Mr. Garrett confess to harming Ms. Tharpe in any way.

85.     At no time did Mr. Garrett confess to choking Ms. Tharpe.

86.     At no time did Mr. Garrett confess to killing Ms. Tharpe.

**An Unrelated Sex Worker is Coerced into Identifying Mr. Garrett so Detectives Can Secure His Arrest in the Tharpe Case.**

87.     Around the same time that they were investigating the Tharpe case, Detectives Dunaway and Miller were convinced (despite any supporting evidence) that Mr. Garrett had been the perpetrator of several unrelated murders of several sex workers.[3]

88.     They were also convinced that Mr. Garrett committed the alleged rape of another sex worker, Maria Swift, in 2000.  Ms. Swift, a cocaine addict, first reported this alleged attack

---

3 Each of these murders were later solved and determined to be unrelated to the Tharpe murder.

14

when the residence where she was staying was searched by police and while she was facing arrest for drug charges in mid-2001.

89.     As a result, in the summer of 2001, Maria Swift was brought in by the MNPD to complete a photo lineup and identify the man who she alleged had raped her (who also happened to drive a tow truck) in an incident unrelated to the Tharpe case.

90.     Although the alleged rape of Ms. Swift was unrelated to the Tharpe case, the MNPD detectives, including Detectives Dunaway and Miller, intended to use Ms. Swift to help them form a basis for an arrest in the Tharpe case.

91.     Detectives Dunaway and Miller prepared a photograph lineup for Ms. Swift, which included a photograph of Mr. Garrett.

92.     Ms. Swift stated that none of the men looked like her attacker.  Instead of accepting her answer, Detectives Dunaway and Miller then told her to pick one that looked "close" and stated that she hadn't picked the "right" person.

93.     As part of coercing Ms. Swift into identifying Mr. Garrett, the detectives falsely told her that they believed he (Mr. Garrett) had killed seven or eight women and that they only had DNA on one and that they needed Ms. Swift's statements to be able "to arrest him."

94.     Ms. Swift succumbed to their coercion and falsely identified Mr. Garrett.

95.     Shortly thereafter, Mr. Garrett was arrested in this unrelated case based on Ms. Swift's coerced identification.

96.     Mr. Garrett was not responsible for the rape of Ms. Swift.

97.     Just days later, Mr. Garrett was also wrongfully arrested for Ms. Tharpe's murder based on Detective Dunaway's fabricated arrest warrant.

15

**The Preliminary Hearing Against Mr. Garrett and Detective Dunaway's False Testimony**

98.     A preliminary hearing was held against Mr. Garrett on August 30, 2001.

99.     In the preliminary hearing, Detective Dunaway falsely and knowingly testified that Mr. Garrett admitted in an interview that he had sex with the victim and choked her.  He went on to falsely testify that Mr. Garrett "pretended that he didn't know that [the victim] was dead but that she was twitching when he left."

100.     Detective Dunaway also falsely testified that Mr. Garrett told him, "Roy, I've got a real problem with choking women."

101.     Detective Dunaway also falsely testified about the recorded exchange between Mr. Garrett and his wife.  He testified that Mr. Garrett had told his wife, "I was present at the time of her [the victim's] death," and demonstrated a choking gesture on his wife which caused her to gag.

102.     All of the above-referenced testimony was false and was inconsistent with the detectives' recorded interviews.

103.     The purported statements did not occur during any of the interrogations (whether recorded or not), nor were there any contemporaneous notes in the investigative file supporting this testimony.  Rather, the detectives had fabricated this evidence in, among other things, false arrest warrants and the polygraph report.

104.     There was never any evidence supporting this testimony from Detective Dunaway; Detective Dunaway knowingly and intentionally fabricated Mr. Garrett's confessions.

105.     To the contrary, the interrogation recordings (which were not produced to Mr. Garrett's counsel until January of 2021) showed that Mr. Garrett consistently asserted his innocence.

16

106. Detective Dunaway did not admit, while on the stand, that he lied to Mr. Garrett and told him that his DNA was found on the victim. Detective Dunaway also failed to mention that he had lied about witnesses placing Mr. Garrett at the scene.

107. Detective Dunaway's lies and omissions were never acknowledged until the post-conviction hearing.

108. Detective Dunaway's false statements, including those in the arrest warrant, were relied upon by the police and the District Attorney's office.

**The DNA Results Exclude Mr. Garrett**

109. Without any eyewitnesses, the only evidence of Ms. Tharpe's murder was the physical evidence collected from the crime scene.

110. On September 5, 2001 – less than a month after Mr. Garrett's arrest – the Tennessee Bureau of Investigation ("TBI") officially notified Detective Dunaway and the MNPD that Mr. Garrett was <u>unequivocally excluded</u> as the contributor to the vaginal, anal, and oral DNA samples collected from Ms. Tharpe.

111. On November 22, 2002, the TBI issued a second report excluding Mr. Garrett from the samples taken from Ms. Tharpe's face and stomach.

112. Two years later, on December 9, 2004, Detective Dunaway and the Davidson County District Attorney's Office received a third report from TBI that spermatozoa present in the vaginal swab and stomach swab matched a third-party, Calvin Atchinson. The report requested that a sample be collected from Atchinson and submitted for comparison.

113. Detective Dunaway and the MNPD never submitted a comparison sample, and despite receiving notice, no action was taken by the District Attorney's Office at that time.

**Unreliable Jailhouse "Informants" Fabricate Confessions by Mr. Garrett.**

114.    The MNPD, Detective Dunaway, and the District Attorney's Office also communicated with two different jailhouse informants, Richard Mayers and David Pursel, who indicated that they had heard Mr. Garrett confess to the murder of Ms. Tharpe.

115.    Neither of these informants' statements, however, were credible. Indeed, one of them even had incorrectly described how Ms. Tharpe had been murdered and where her body had been found.

116.    Detective Dunaway and the District Attorney's Office then relied upon these "confessions" to bolster its case in plea discussions with Mr. Garrett and his lawyer.

117.    The Assistant District Attorney who was working the Tharpe case, however, determined that neither of the jailhouse informants were credible. She determined that she could not call either to testify if the case went to trial.

118.    Neither MNPD, its detectives, nor the District Attorney's Office disclosed to Mr. Garrett that they had serious concerns about the credibility of the jailhouse informants' statements implicating Mr. Garrett.

**Mr. Garrett is Coerced into a Guilty Plea.**

119.    On June 20, 2003, more than a year after his arrest and while spending that entire time in jail, Mr. Garrett accepted a guilty plea for Voluntary Manslaughter, as defined in Tennessee Code Annotated Section 39-13-211.

120.    Mr. Garrett accepted this guilty plea because he: (i) had been worn down by the concerted efforts to pin the murder on him, (ii) had already spent substantial time in jail, (iii) had lost faith in the justice system, and (iv) had been told that he could receive the death penalty if he did not enter into a plea agreement.

18

121.    Mr. Garret came to believe that the evidence was stacked against him and that if he lost at trial, he would face the death penalty.

122.    At the time of Mr. Garrett's guilty plea, he did not have the exculpatory information described generally herein, which was in the possession of the MNPD, which would have enabled him to plead knowingly and voluntarily.

123.    At the time of his plea, Mr. Garrett had not been given complete copies of the interrogation recordings.

124.    At the time of his plea, Mr. Garrett had not been told that DNA results conclusively ruled him out or that the State knew his DNA was not a match.

125.    At the time of his plea, Mr. Garrett had not been informed that Ms. Swift had been coerced into identifying him as a perpetrator.

126.    At the time of his plea, Mr. Garrett was not aware that the District Attorney's Office had already concluded that the jailhouse informants who claimed that he had confessed were not credible and that they would not have been willing to call either at trial.

127.    At the time of his plea, Mr. Garrett was not aware that the referenced DNA evidence would have strongly implicated Atchison in the murder of Ms. Tharpe.

128.    Mr. Garrett was ultimately sentenced to 15 years in prison.

129.    Even after the additional exculpatory DNA testing results implicating Atchison were obtained in 2004, Mr. Garrett remained in prison and was not provided notice of the results.

**The 2011 Re-Investigation Confirming Mr. Garrett's Innocence.**

130.    In June of 2011, in relation to an investigation by Detective Mike Roland and Sergeant Pat Postiglione involving the murder of another sex worker (which had led these detectives to reexamine other similar cases, including the Tharpe case), Detective Mike Roland of

19

the MNPD Homicide Cold Case Unit located an official TBI letter to Detective Dunaway notifying him of a CODIS hit in the Velma Tharpe case.

131.    Detective Roland also reviewed the initial investigative file and noticed it did not contain much information.  The file lacked supplemental reports, TBI reports, polygraph results, and other information.

132.    A log within the file indicated that Detective Dunaway had checked out a binder with portions of the file, but it was never returned.

133.    Due to this missing information, Detective Roland reached out to the TBI.

134.    The TBI directed Detective Roland to Agent Boos, from whom Detective Roland requested any reports made on the case.  Agent Boos asked Detective Roland about the Combined DNA Index System ("CODIS") hit on Calvin Atchison.  Detective Roland knew nothing about it, and the investigative file did not mention Calvin Atchison at all.

135.    On June 28, 2011, Detectives Mike Roland and Lee Freeman met with Calvin Atchinson.  Mr. Atchinson denied having ever killed anyone but admitted that he had interacted with prostitutes in the Nashville area around the time of the victim's death. During this interview, Mr. Atchinson consented to the collection of oral swabs for DNA testing.

136.    On July 13, 2011, Detective Roland and Sergeant Postiglione met with Mr. Garrett in the Turney Center Annex in Clifton, Tennessee.  Mr. Garrett maintained his innocence.

137.    On July 14, 2011, the TBI issued the DNA findings, which conclusively matched Mr. Atchinson and provided clear and convincing evidence of Mr. Garrett's innocence.

138.    In an August 22, 2011, report, Sergeant Postiglione summarized his investigation and expressed his "humble opinion that Paul Garrett did not kill Velma Tharpe." Sergeant Postiglione cited both the lack of evidence against Mr. Garrett and the coercive investigative

tactics: "Contrary to what the homicide warrant reads, I did not hear Paul Garrett admit to killing anyone. I did hear investigators convince Garrett that he had sex with the victim. I did hear investigators suggest to Garrett that he strangled the victim during sex."

139. Based on the entirety of his investigation, Detective Roland also believed that Calvin Atchison killed Velma Tharpe. He did not believe that Mr. Garrett committed the offense. There was nothing to indicate that anyone other than Atchinson was involved.

140. By 2011, the District Attorney's Office, including, Torry Johnson, the District Attorney at the time, was made aware of DNA testing results implicating Mr. Garrett, the coercive tactics used by the investigating police officers, and the other discrepancies in the evidence. Despite learning about such information while Mr. Garrett was still incarcerated, the District Attorney's Office refused to acknowledge that the evidence strongly indicated that Mr. Garrett was innocent and had been wrongfully convicted. Instead, Mr. Johnson wrote a letter to the Board of Probation and Parole stating that he did not believe Garrett could be exonerated, but that Garrett should be released due to the questions about his guilt.

**DNA Testing in 2011 Confirms Atchinson's Guilt and Garrett's Innocence.**

141. In 2011, Detective Mike Roland and Sergeant Pat Postiglione requested that the TBI conduct DNA analysis for a fourth time in the Tharpe case, using new testing methods.

142. During this fourth round of DNA analysis, detectives submitted a sample from Atchinson to compare to the spermatozoa found on Ms. Tharpe's body.

143. This testing confirmed that sperm fractions in the vaginal swab matched Calvin Atchinson and that "the probability of an unrelated individual having the same DNA profile ... currently exceeds the current world population."

21

144.     This testing also confirmed that sperm fractions present in the swab from Ms. Tharpe's stomach matched Atchinson.

145.     Both samples recovered from Ms. Tharpe were single contributor profiles, meaning that no DNA from another person was detected in the vaginal or stomach samples.

146.     The three condoms collected at the scene revealed two unknown males and one unknown female profile (each wrapper was a single profile).

147.     Eight stained areas were sampled from Ms. Tharpe's shorts, found next to her body. Seven of those eight samples revealed the presence of Atchinson's DNA profile in sperm or non-sperm fractions.  Again, these were all single contributor profiles.

148.     There was no other unknown male DNA located on Ms. Tharpe's shorts.

149.     Every round of DNA testing conclusively excluded Mr. Garrett as a potential source of the DNA evidence.

**In August of 2021, Mr. Garrett's Conviction is Declared Void for Lack of Evidence.**

150.     Nearly ten years later, on July 22, 2021, Mr. Garrett's Petition for Post-Conviction Relief was heard before the Honorable Angelita Blackshear Dalton in the Criminal Court for Davidson County.

151.     A report made by Assistant District Attorney General Kathy Morante was submitted to the Court.

152.     Prior to its submission, Detective Roland reviewed the report and adopted its findings.  The report concluded that Mr. Garrett was innocent of the murder of Velma Tharpe.

153.     Mr. Garrett testified and again asserted his innocence.

154.     This post-conviction proceeding marked the first in-court proceeding for which all information in the possession of either party had been fully disclosed.  The Court found that this

was the first proceeding in which the evidence had not been tainted by the submission of misinformation—*i.e.*, the persistent fabricated "evidence" that Mr. Garrett confessed to the murder.

155.    The Court found that Mr. Garrett was conclusively excluded from every DNA sample associated with the case.

156.    The Court found that the DNA/semen samples from the victim's body conclusively identified Calvin Atchison as their contributor.

157.    The Court found that Garrett never confessed to Ms. Tharpe's murder, despite what was alleged during prior court proceedings and left uncorrected until the July 2021 hearing.

158.    The Court further found that the techniques used by Detectives Dunaway and Detective Bernard were, at best, questionable and led the court to rely on inaccurate and misleading information Mr. Garrett's conviction was finally rendered void and was vacated.

**Additional Background**

159.    At or near the time that the Tharpe investigation was ongoing, Detectives Dunaway and Bernard were known for their deceptive tactics and had been known to give false testimony. Indeed, it has since become public knowledge that Detectives Dunaway and Bernard lied under oath and/or fabricated evidence on multiple occasions, including at or near the time that the Tharpe investigation was ongoing.

160.    In May of 2021, based upon the DNA evidence that the re-investigation by Detective Roland and Sergeant Postiglione uncovered, Calvin Atchison was indicted for the murder of Ms. Tharpe.

## CAUSES OF ACTION
## Federal Constitutional Violations
## Count I: Federal Constitutional Violations for Withholding
## Exculpatory Evidence Pre-Trial
## (Against MNPD Individual Defendants)

161.  Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

162.  As described more fully above, Defendants Dunaway, Haney, West, Miller, and Bernard, in the course and scope of their employment as detectives with MNPD, deliberately withheld exculpatory evidence during Mr. Garrett's pretrial proceedings.  In doing so, these defendants violated their clearly established duty to disclose all material and exculpatory impeachment information to prosecutors and Mr. Garrett.  *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995) (confirming that *Brady* obligations apply to evidence in both the prosecutors' and police's possession).

163.  As described more fully above, Detective Dunaway and other MNPD detectives (Detectives West, Haney, and Bernard) interrogated Mr. Garrett on several occasions between August 8, 2001, and August 14, 2001, and also recorded a private conversation between Mr. Garrett and his wife.  Other than the unrecorded interrogation during the car ride excursion, these manipulative interrogations had been recorded by the detectives.

164.  Defendants Dunaway, Haney, West, and Bernard knew that the above-referenced interrogations were being recorded and that Mr. Garrett had denied killing Ms. Tharpe during each interrogation, and that that Mr. Garrett had maintained his innocence throughout each interrogation.

165.  Detective Dunaway later falsely testified and fabricated evidence relating to each of the referenced interrogations and other discussions involving Mr. Garrett.  Specifically,

24

Detective Dunaway falsely testified that during his unrecorded car ride with Mr. Garrett and at other times, Mr. Garrett confessed to the murder of Velma Tharpe. Detective Dunaway also falsely testified that Mr. Garrett had confessed to choking Ms. Tharpe and had identified where her body was found. Detective Dunaway also falsely testified that Mr. Garrett had told his (Mr. Garrett's) wife that he "was present at the time of [Tharpe's] death" and that he had demonstrated on the method of strangulation on his wife and caused her to gag.

166. The referenced false and fabricated evidence was used and relied on by the MNPD and the District Attorney's office throughout Mr. Garrett's criminal proceedings. Most notably, they relied upon this fabricated evidence in obtaining Mr. Garrett's arrest warrant and during the preliminary hearing.

167. In addition to providing false sworn statements and testimony, Detective Dunaway and the other MNPD Individual Defendants withheld complete copies of the audio recordings of each of Mr. Garrett's recorded interrogations, which conclusively proved that Detective Dunaway's sworn statements and testimony regarding Mr. Garrett's statements were false.

168. Despite participating in the interrogations of Mr. Garrett and knowing that Mr. Garrett did not confess to murdering Ms. Tharpe, Defendants Haney, West, and Bernard also withheld complete copies of the audio recordings of each of Mr. Garrett's recorded interrogations.

169. The complete audio recordings of Mr. Garrett's interrogations were exculpatory evidence. The complete copies of these recordings made clear that Mr. Garrett had not confessed to the Tharpe murder at any time.

170. The complete audio recordings of Mr. Garrett's interrogations were also exculpatory in that they were evidence contradicting Detectives Dunaway and Bernard's false testimony and written statements/reports that Mr. Garrett had confessed when he, in fact, had not.

171.    Defendants Dunaway and Miller also fabricated and/or coerced Ms. Swift into identifying Mr. Garrett as the perpetrator when, in fact, Ms. Swift had not initially identified him, had been told that she had not picked the "right" person, and to pick the one that was close, thereby coercing her into picking Mr. Garrett.

172.    The fact that Ms. Swift had not independently identified Mr. Garrett as part of the initial photo lineup and had done so only after being coerced by Defendants Dunaway and Miller was exculpatory evidence was not disclosed.

173.    Detective Dunaway and the other MNPD Individual Defendants also withheld exculpatory evidence relating to the above-referenced jailhouse informants. Specifically, the fact that one of the jailhouse "informants" with whom the above-referenced detectives and/or the prosecution relied upon to justify their continued wrongful prosecution of Mr. Garrett would not be called to testify at trial against Mr. Garrett (in large part due to the informant's lack of credibility) was also not disclosed to Mr. Garrett.

174.    All of the referenced evidence, as well as other evidence referenced in this Complaint, was favorable and material to the case against Mr. Garrett.

175.    At relevant times, each of the defendants named herein were acting under color of state law when they failed to disclose such exculpatory evidence concerning Mr. Garrett to the prosecution and/or the defense and lied in obtaining a warrant for Mr. Garrett's arrest, during his pre-trial proceedings, and/or prior to his guilty plea.

176.    Absent Defendants' misconduct, the prosecution of Mr. Garrett could not and would not have been pursued, and Mr. Garrett would not have been unlawfully arrested, charged, and been coerced into pleading guilty to the murder of Velma Tharpe.

177. Each of the Defendants referenced in this count committed the actions and/or omissions referenced in this count under the color of state law and by virtue of their authority as detectives of the MNPD and substantially deprived Mr. Garrett of his rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived Mr. Garrett of the rights guaranteed to him by the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

178. The misconduct described in this Count was objectively unreasonable, shocks the conscience, and was undertaken intentionally, with malice and willful indifference to Mr. Garrett's clearly established constitutional rights, including his right to a fair trial, to be free from arrest without probable cause, and to access to exculpatory evidence pre-trial.

179. Each of the unconstitutional acts and/or omissions generally described above was a cause in fact and legal cause of the personal injuries, harms, losses, and damages sustained by Mr. Garrett for which he seeks recovery herein pursuant to applicable law.

### Count II: Federal Constitutional Violations for Withholding Exculpatory Evidence During Post-Conviction Proceedings (Against MNPD Individual Defendants)

180. Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

181. As described more fully above, the MNPD Individual Defendants deliberately withheld exculpatory evidence during Mr. Garrett's post-conviction proceedings. In doing so, these defendants violated their clearly established duty to disclose all material and exculpatory impeachment information. *See, e.g., Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (describing that a Sec. 1983 claim may exist against police officers for failing to disclose exculpatory evidence during post-conviction proceedings and affirming denial of motion to

dismiss claiming that officers have qualified immunity for such failure)[4]; *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 1568 (1995) (reaffirming that *Brady* obligations apply to evidence in both the prosecutors' and police's possession).

182. As described more fully above, Detectives Dunaway, West, Haney, and Bernard interrogated Mr. Garrett on several occasions between August 8, 2001, and August 14, 2001, and many of these interrogations were recorded.

183. Defendants Dunaway, Haney, West, and Bernard knew that the above-referenced interrogations were being recorded and that Mr. Garrett denied killing Ms. Tharpe during each interrogation and had maintained his innocence.

184. As described above, throughout Mr. Garrett's initial investigation and continuing through his post-conviction proceedings, Defendants failed to disclose exculpatory evidence, including but not limited to:

      i.     The complete audio recordings of Mr. Garrett's recorded interrogations and the conversation with his wife, which all confirmed that Mr. Garrett had not at any time confessed to the Tharpe murder;

     ii.     Evidence that Ms. Swift had identified Mr. Garrett in the photo lineup only after being coerced into doing so and that she had initially stated that none of the photographs shown to her (including that of Mr. Garrett) matched the man who had allegedly raped her; and

---

4 Alternatively, Mr. Garrett's rights to the disclosure of the exculpatory evidence during his post-conviction proceedings were clearly established because the detective's conduct was "so egregious that no reasonable person could have believed that it would not violate clearly established rights." *See id.*

iii. Evidence that neither of the jailhouse "informants" would be called to testify against Mr. Garrett at a trial due to credibility issues.

185. Each of these pieces of evidence was favorable and material to the case against Mr. Garrett.

186. Further, despite participating in the interrogations of Mr. Garrett and knowing that Mr. Garrett did not confess to murdering Ms. Tharpe, that the Swift identification was coerced, and that the jailhouse "informants" claimed confessions were not credible, Defendants Dunaway, Haney, West, and Bernard continued to withhold complete copies of the recordings from Mr. Garrett's interrogations and other exculpatory information throughout Mr. Garrett's post-conviction proceedings, including during the proceedings on his Petition for Writ of Error *Coram Nobis*.

187. Absent Defendants' misconduct, Mr. Garrett's counsel would have been able to present full and complete evidence of his innocence during his post-conviction proceedings, including evidence to contradict the fabricated evidence that Mr. Garrett had admitted to the murder while being interrogated by detectives and/or to jailhouse informants.

188. However, because Defendants continued to withhold such exculpatory evidence, the State continued to contest Mr. Garrett's post-conviction petitions relying on the fabricated and false evidence referenced, including but not limited to Mr. Garrett's purported confessions. During the same period of time, Mr. Garrett lacked the benefit of the complete audio recordings as contradictory, exculpatory evidence as well as the other exculpatory evidence referenced herein.

189. Each of the defendants referenced in this count committed the actions and/or omissions referenced herein under the color of state law and by virtue of their authority as detectives of the MNPD and substantially deprived Mr. Garrett of his rights, privileges and

29

immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived Mr. Garrett of the rights guaranteed to him by the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

190.    The misconduct described in this Count and throughout this Complaint was objectively unreasonable, shocks the conscience, and was undertaken intentionally, with malice and willful indifference to Mr. Garrett's clearly established constitutional rights, including his right to a fair trial and to access to exculpatory evidence during post-conviction proceedings.

191.    Each of the unconstitutional acts and/or omissions generally described above was a cause in fact and legal cause of personal injuries, harms, losses, and damages sustained by Paul Garrett for which Plaintiff seeks recovery herein pursuant to applicable law.

## Count III: Federal Constitutional Violations for Fabrication of Evidence (Against Defendants Dunaway, Bernard, and Miller)

192.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

193.    As described more fully above, Defendants Dunaway, Bernard, and Miller deliberately fabricated evidence, including but not limited to drafting, disseminating, and relying upon false reports and other evidence that Mr. Garrett had made inculpatory statements, including but not limited to the referenced false assertions that Mr. Garrett had confessed to killing Ms. Tharpe, that he had confessed to choking Ms. Tharpe, and that he had identified the location of her body, as well as coercing the identification of Mr. Garrett by Ms. Swift. In doing so, these defendants violated Mr. Garrett's clearly established due process rights. *See, e.g., Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).

194.    As described more fully above, defendants Dunaway, Bernard, and Miller fabricated evidence to formulate a pretense of probable cause to obtain the unlawful arrest of

30

Mr. Garrett, the continued detention of Mr. Garrett, and to induce a false guilty plea and unlawful conviction, of Mr. Garrett when he did not, in fact, commit the Tharpe murder.

195.     Among other things, Defendant Dunaway fabricated evidence, particularly the sworn affidavit of criminal warrant by falsely reporting in such affidavit that Mr. Garrett had made inculpatory statements concerning the murder of Ms. Tharpe, including that he had choked Ms. Tharpe.    This fabricated evidence was used and relied upon in wrongfully and unconstitutionally arresting, charging, prosecuting, and obtaining a conviction against Mr. Garrett.

196.     Among other things, Defendant E.J. Bernard fabricated evidence, particularly the polygraph examiner's report in which he falsely reported that Mr. Garrett had made inculpatory statements concerning the murder of Ms. Tharpe, including that he had confessed to choking prostitutes and that he choked Ms. Tharpe.    This polygraph report was used and relied upon in wrongfully and unconstitutionally arresting, charging, prosecuting, and obtaining a conviction against Mr. Garrett for the death of Ms. Tharpe.

197.     Defendants Dunaway and Miller also fabricated and/or coerced evidence that Ms. Swift had positively identified Mr. Garrett in a photo lineup when, in fact, Ms. Swift had only identified Mr. Garrett after she was coerced into doing so by Detectives Miller and Dunaway.

198.     When Defendants Dunaway and Bernard wrote the criminal warrant, the polygrapher's report, and coerced Ms. Swift's identification of Mr. Garrett, they knew that they were fabricating evidence against Mr. Garrett, including key "evidence" that Mr. Garrett had confessed.

199.     Absent the false evidence manufactured by Defendants Dunaway, Bernard, and Miller, there would not have been evidence sufficient to support a finding that there was probable cause to arrest or continue to detain Mr. Garrett.    There also would not have been sufficient

evidence to prosecute Mr. Garrett, to convince Mr. Garrett that he was likely to lose at trial in plea negotiations, or to obtain a conviction against Mr. Garrett for Ms. Tharpe's death.

200.    As a direct and proximate result of these Defendants' misconduct, charges were filed against Mr. Garrett for Ms. Tharpe's murder.

201.    As a further direct and proximate result of these Defendants' misconduct, Mr. Garrett was wrongfully and unconstitutionally seized and prosecuted for the Tharpe murder. This prosecution continued against Mr. Garrett, including through his post-conviction proceedings, where the State continued to rely on the above-referenced fabricated evidence that Mr. Garrett had confessed and/or made inculpatory statements concerning Ms. Tharpe's murder.

202.    Indeed, Mr. Garrett's Petition for *Writ of Coram Nobis* was denied in substantial part because of the reliance on the fabricated evidence that Mr. Garrett had confessed to Ms. Tharpe's murder.

203.    Each of the Defendants referenced in this count committed the actions and/or omissions referenced herein under the color of state law and by virtue of their authority as detectives of the MNPD and substantially deprived Mr. Garrett of his rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived Mr. Garrett of the rights guaranteed to him by the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

204.    The misconduct described in this Count was objectively unreasonable, shocks the conscience, and was undertaken intentionally, with malice, and with willful indifference to Mr. Garrett's clearly established constitutional rights, including his right to a fair trial, to be free from having false evidence presented against him, and to be free from arrest without probable cause.

205.    Each of the unconstitutional acts and/or omissions generally described above was

a cause in fact and legal cause of personal injuries, harms, losses, and damages sustained by Paul Garrett for which he seeks recovery herein pursuant to applicable law.

## Count IV: Failure to Intervene
### (Against MNPD Individual Defendants)

206. Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

207. Defendants Dunaway, Bernard, West, Miller, and Haney had a duty to prevent the referenced misconduct, including but not limited to, the deliberate withholding of exculpatory evidence and the fabrication of evidence that caused Mr. Garrett to be unconstitutionally arrested, charged, and convicted of the murder of Ms. Tharpe (including having his post-conviction proceedings wrongfully opposed).

208. Each of the Defendants identified failed to prevent the referenced misconduct, including but not limited to, the deliberate withholding of exculpatory evidence and the fabrication of evidence that caused Mr. Garrett to be unconstitutionally arrested, charged, and convicted of the murder of Ms. Tharpe (including having his post-conviction proceedings wrongfully opposed).

209. As a result of these defendants' failure to intervene to prevent the violations of Mr. Garrett's constitutional rights, Mr. Garrett suffered the losses and damages generally described herein, including his prolonged incarceration for a crime he did not commit. These defendants were present for such constitutional violations and had a reasonable opportunity to prevent this harm but failed to do so.

210. Each of the defendants referenced in this count committed the omissions referenced in this count under the color of state law and by virtue of their authority as detectives of the MNPD and substantially deprived Mr. Garrett of his rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived

33

Mr. Garrett of the rights guaranteed to him by the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

211.    The misconduct described in this Count was objectively unreasonable, shocks the conscience, and was undertaken intentionally, with malice, and with willful indifference to Mr. Garrett's clearly established constitutional rights, including his right to a fair trial, to the disclosure of exculpatory evidence, and to be free from the use of fabricated evidence.

212.    Each of the unconstitutional acts and/or omissions generally described above was a cause in fact and legal cause of personal injuries, harms, losses, and damages sustained by Paul Garrett for which Plaintiff seeks recovery herein pursuant to applicable law.

### Count V: Federal Constitutional Violations – *Monell* Failure to Train or Supervise Concerning the Prohibition on Fabrication of Evidence, the Duty to Produce Exculpatory Evidence, and the Duty to Intervene (Against Defendant Metro Nashville)

213.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

214.    A plaintiff may "establish 'a single violation of federal rights, accompanied by a showing that [Defendant] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 739 (6th Cir. 2015) (citing City of Canton v. Harris, 489 U.S. 378, 390 (1989)) (reversing grant of summary judgment in favor of healthcare company that stood in the County's shoes for liability under § 1983); *see, e.g., Jackson v. City of Cleveland*, 925 F.3d 793, 836-37 (6th Cir. 2019) (reversing grant of summary judgment in favor of County on *Monell* failure to train on police officer's disclosure obligations).

215.    Metro Nashville is liable for the violations of Mr. Garrett's constitutional rights described herein because it was deliberately indifferent to and failed to provide (or ensure the

34

provision of) adequate training and supervision of MNPD officers, including MNPD detectives, to prevent the foreseeable and obvious risk that MNPD officers would fabricate evidence, withhold exculpatory evidence, and/or to fail to intervene to prevent others from engaging in such conduct, in violation of the constitutional rights of the accused.

216. Metro Nashville failed to adequately train and educate its officers with respect to: (i) their duty to disclose exculpatory evidence; (ii) the prohibition on the fabrication of evidence; and (iii) the duty to intervene; each of which it knew or had reason to know its officers would be required to do in the field, would repeatedly encounter while working in the field, and which posed a serious risk of constitutional violations, including wrongful arrests and convictions, upon citizens they would encounter; such failure to train and supervise its officers was in deliberate indifference to and reckless disregard of the welfare of the public at large, including Mr. Garrett.

217. While the Tharpe murder was being investigated through the time Mr. Garrett was convicted and commenced post-conviction proceedings, it was clearly established that police officers (i) had an obligation to disclose exculpatory evidence, *see e.g. Newsome v. McCabe*, 256 F.3d 747, 752-53 (7th Cir. 2001) ("[W]as it clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints and the conduct of a lineup? The answer is yes: The *Brady* principle was announced in 1963, and we applied it in *Jones* to affirm a hefty award of damages against officers who withheld exculpatory information in 1981."); (ii) were prohibited from fabricating evidence, *see Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997); and (iii) had a duty to intervene to prevent an accused's constitutional rights from being violated by another officer, *see* Smith v. Heath, 691 F.2d 220, 224 (6th Cir. 1982)).

218. Metro Nashville's failure to adequately train and/or supervise its officers is

evidenced by the pattern and practice of fabricating evidence and withholding evidence in the case against Mr. Garrett, as referenced herein.

219.    The sheer number of individuals who had actual knowledge of the matters described herein and who had an opportunity to prevent the wrongful arrest, detention, and conviction of Mr. Garrett, but who failed to do so over a period of years, is itself clear evidence that Metro Nashville was deliberately indifferent to and, in fact, failed to ensure that its personnel were adequately trained and adequately supervised, with respect to the avoidance and prevention of the falsification and fabrication of evidence and the need to disclose exculpatory evidence.

220.    Metro Nashville's failure to adequately train and/or supervise its officers is also evidenced by lack of adequate written policies and training materials concerning the duty to disclose exculpatory evidence, the prohibition on fabrication of evidence, and the duty to intervene.  Metro Nashville failed to put in place adequate and proper protocols, training, and supervision for officers and detectives concerning, among other things, the duty to disclose exculpatory evidence and the prohibition on fabrication of evidence.

221.    As a result of Metro Nashville's failure to provide adequate training and supervision, and to put into place adequate and proper protocols, exculpatory evidence was repeatedly withheld in the case against Mr. Garrett and evidence against Mr. Garrett was fabricated by MNPD detectives.  These failures by Metro Nashville were a cause in fact and legal cause of the incalculable losses and damages sustained by Mr. Garrett as generally described herein.

222.    Metro Nashville also failed to enact proper and adequate protocols, training, and supervision for officers and detectives concerning, among other things, the duty to intervene.  As a result, numerous MNPD detectives participated in and/or knew of such violations of Mr. Garrett's constitutional rights and had the opportunity to intervene but failed to do so; this

failure by Metro Nashville was a cause in fact and legal cause of the incalculable losses and damages sustained by Mr. Garrett as generally described herein.

223.    At relevant times, Metro Nashville's training materials and written policies did not appropriately and/or sufficiently address and train MNPD officers regarding the established law that it is unconstitutional for police officers to fabricate or manufacture evidence, to withhold exculpatory evidence during criminal proceedings, and the duty to intervene, and that such conduct may violate an accused's constitutional rights.

224.    Additionally, Metro Nashville failed to adequately supervise, monitor, and evaluate the performance of its detectives and their disclosure of exculpatory evidence, their fabrication of evidence, and their duty to intervene as described herein.

225.    Metro Nashville knew or should have known that the MNPD officers were not being adequately trained and/or supervised with respect to the avoidance and prevention of the falsification and fabrication of evidence and the need to disclose exculpatory evidence.

226.    At all relevant times and considering the circumstances described herein, Metro Nashville had actual notice that it lacked appropriate and/or sufficient written policies and training: describing an officer/detective's duty to disclose exculpatory evidence; describing the prohibition on the fabrication or manufacturing of evidence, including confessions; describing an officer's duty to intervene; and describing an accused's constitutional right to due process and a fair trial.

227.    Despite being on notice that its training and supervision of MNPD officers was inadequate, Metro Nashville was deliberately indifferent and failed to implement adequate training and/or supervision of MNPD officers to avoid future, dangerous constitutional violations, particularly those caused by officers withholding exculpatory evidence and fabricating evidence.

228.    It was foreseeable that MNPD officers in the field would routinely and repeatedly

encounter situations in which they would be prohibited from fabricating evidence, have a duty to produce exculpatory evidence, and/or have a duty to intervene. The failure of Metro Nashville to ensure adequate policies, training, and supervision with respect to the issues described herein is proof that Metro Nashville was deliberately indifferent to the risks that citizens' constitutional rights would be violated.

229. Metro Nashville's conduct, as referenced in this Count, was a critical contributing factor in causing Mr. Garrett to be substantially deprived of the rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived Mr. Garrett of the rights guaranteed to him by the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

230. As a direct result of Metro Nashville's failure to have adequate written policies and training and/or Metro Nashville's deliberately indifferent and inadequate training and supervision regarding the foreseeable situations previously described, Mr. Garrett's constitutional rights were violated, including but not limited to exculpatory evidence being repeatedly withheld on at least two separate occasions (pre-trial and during post-conviction proceedings) and evidence being fabricated against Mr. Garrett, causing Mr. Garrett to suffer the serious and incalculable losses and damages generally described herein.

231. Each of said Defendants' unconstitutional acts and/or omissions generally described in this count was a cause in fact and legal cause of personal injuries, harms, losses, and damages sustained by Paul Garrett for which he seeks recovery herein pursuant to applicable law.

### Count VI: Federal Constitutional Violations – <br> *Monell* Policy, Practice, or Custom of Allowing Detectives to Fabricate Evidence, <br> Failing to Intervene, and Failing to Disclose Exculpatory Evidence <br> (Against Defendant Metro Nashville)

232. Plaintiff hereby incorporates, in their entirety, each and every paragraph above by

reference as if fully set forth in this count.

233.     Metro Nashville is liable for the violations of Mr. Garrett's constitutional rights because it permitted, encouraged, and tolerated a pattern, practice, or custom of MNPD officers, including detectives, violating the constitutional rights of the public at large, including Mr. Garrett, by allowing them to withhold exculpatory evidence, fabricate evidence, and fail to intervene.

234.     As evidenced by the routine and repeated misconduct in the case against Mr. Garrett, as described herein, it was Metro Nashville's *de facto* custom, policy, and practice to allow detectives to withhold exculpatory evidence, to fabricate evidence, and to fail to intervene. This *de facto* custom, policy, and practice is evidenced by: (i) the fact that numerous detectives were aware of, participated in, approved of, and/or failed to intervene concerning the withholding of exculpatory evidence and the fabrication of evidence against Mr. Garrett; and (ii) Metro Nashville's approval of and reliance upon the investigation and its failure to reprimand the detectives involved for withholding exculpatory evidence and/or fabricating evidence.

235.     At the time of the investigation of the Tharpe murder, the information that the MNPD Individual Defendants, particularly Detectives Dunaway, Bernard, and Miller, had fabricated evidence was known or should have been known within the MNPD.  However, no one within the MNPD took adequate steps to confirm whether any of such detectives' fabricated evidence (such as Mr. Garrett's confession, which was readily verifiable by members of the MNPD) was in fact accurate or reliable.

236.     As described generally above, the facts establishing the first basis for Metro Nashville's custom, practice, and/or *de facto* policy of permitting detectives to withhold exculpatory evidence, to fabricate evidence, and/or to refrain from intervening is evidenced by the number of MNPD detectives and/or officers who, through the course of participating in the Tharpe

investigation, withheld exculpatory evidence, fabricated evidence against Mr. Garrett, and failed to intervene to prevent such constitutional violations against Mr. Garrett.

237.    The facts establishing the second basis for Metro Nashville's custom, practice, and/or *de facto* policy of permitting detectives to withhold exculpatory evidence, to fabricate evidence and/or to refrain from intervening is evidenced by MNPD, including through its supervisory officials, giving tacit approval of the MNPD detectives' conduct, failing to investigate the events described herein for the purpose of determining whether any unconstitutional or wrongful conduct had occurred.

238.    Had it been Metro Nashville's practice to prevent the fabrication of evidence and/or the failure to disclose exculpatory evidence, then such conduct could and would have been prevented in this instance.  Further, there would have been some type of contemporaneous investigation and/or reprimand and/or other control measures to hold the detectives accountable.

239.    Through its failure to adequately investigate or reprimand the MNPD Individual Defendants for their failure to disclose exculpatory evidence (which could have easily been confirmed by Metro Nashville at the time), for their failure to intervene, and their fabrication of evidence, Metro Nashville tacitly approved of the use of such methods.

240.    Further, following the subject events with Mr. Garrett, MNPD failed to institute any additional or appropriate policies or training on the duty to disclose exculpatory evidence and/or the prohibition on the fabrication of evidence. If the MNPD Individual Defendants' conduct during the Tharpe investigation and prosecution was not in accordance with Metro Nashville's *de facto* customs, policies, and practices, then there would have been some investigation into, reprimand, training, and/or new policies instituted concerning these important constitutional rights and officers' duties concerning them.

40

241. Evidently, following the fabrication of evidence concerning Mr. Garrett's guilt (which was readily available to be confirmed or questioned by supervisors of the MNPD) and the withholding of exculpatory evidence, none of the MNPD Individual defendants were disciplined for their conduct, which further indicates that their conduct was in accordance with the policies, practices, and customs of Metro Nashville during the relevant period.

242. Metro Nashville's *de facto* policy, practice, or custom of allowing detectives to withhold exculpatory evidence and/or to fabricate evidence is also evidenced by the detectives' repeated failure to record any such confessions and to provide complete and accurate information concerning any interviews/interrogations in their reports. Instead, the detectives were permitted to repeatedly interrogate Mr. Garrett without recordings, to fail to maintain contemporaneous notes concerning such interrogations, and then to unilaterally write reports or warrants that included false information concerning such interrogations. These failures reflect MNPD tacitly approving and/or affirming that using such methods was consistent with its policies, customs, or practices.

243. Metro Nashville committed the actions and/or omissions referenced in this count, which was a critical factor in causing Mr. Garrett to be substantially deprived of his rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived Mr. Garrett of the rights guaranteed to him by the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

244. Metro Nashville's unlawful customs, practices, and *de facto* policies of permitting deputies to withhold exculpatory evidence, to fabricate evidence, and to fail to intervene to prevent such constitutional violations were foreseeable and were the moving force behind and proximately caused the deprivation of Mr. Garrett's constitutional rights under the Fourth, Sixth, and Fourteenth Amendments as described herein.

245.     Consistent with and as a direct and proximate result of Metro Nashville's unconstitutional customs, practices and *de facto* policies described above, Mr. Garrett's constitutional rights were violated, including but not limited to several detectives withholding exculpatory evidence, fabricating evidence, and failing to intervene and report when another detective withheld exculpatory evidence or fabricated evidence, which caused Mr. Garrett to suffer the serious and incalculable losses and damages generally described herein.

246.     These unconstitutional acts and/or omissions by Metro Nashville generally described in this count was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by Paul Garrett for which he seeks recovery herein pursuant to applicable law.

## Count VII: Conspiracy to Deprive Constitutional Rights
### (Against MNPD Individual Defendants)

247.     Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

248.     As set forth above, throughout the investigation, the MNPD Individual Defendants worked together and conspired to withhold and suppress favorable, material evidence from Mr. Garrett; to fabricate and falsify evidence against him when they knew that there was no actual evidence linking him to the crime; and to cause the commencement and/or continuation of the baseless prosecution against him when they knew that the only evidence supporting such prosecution had been fabricated and/or improperly coerced.

249.     As set forth above, Defendants engaged in overt acts in furtherance of this conspiracy, including but not limited to: fabricating evidence in the arrest warrant that Mr. Garrett had confessed and/or made inculpatory statements; fabricating evidence in the polygraph report; providing false testimony during the preliminary hearing; and withholding exculpatory evidence, including but not limited to:

42

i.      The complete audio recordings of Mr. Garrett's recorded interrogations and the conversation with his wife, which all confirmed that Mr. Garrett had not at any time confessed to the Tharpe murder;

ii.    Evidence that Ms. Swift had identified Mr. Garrett in the photo lineup only after being coerced into doing so and that she had initially stated that none of the photographs shown to her (including that of Mr. Garrett) matched the man who had allegedly raped her; and

iii.   Evidence that neither of the jailhouse "informants" would be called to testify against Mr. Garrett at a trial due to credibility issues.

250.    All of the referenced evidence was favorable and material to the case against Mr. Garrett.

251.    Each of the reference actions by the Defendants was done in furtherance of their conspiracy to obtain a wrongful conviction of Mr. Garrett, and to deprive Mr. Garrett of his constitutional rights.

252.    All of the misconduct referenced herein was a foreseeable consequence and result of the Defendants' conspiracy to violate Mr. Garrett's constitutional rights.

253.    As a result of the defendants' acts and/or omissions as described generally herein, which were committed with deliberate indifference to Mr. Garrett's constitutional rights, Mr. Garrett was induced into taking a plea agreement to obtain a reduced sentence and avoid the risks that had been presented to him of the death penalty and/or life in prison.

254.    The acts and/or omissions described herein caused the continued prosecution of Mr. Garrett despite his obvious innocence; this prosecution continued through Mr. Garrett's post-conviction proceedings and in connection with Petition for Writ of Error *Coram Nobis*.

255. As a direct result of the defendants' deliberate indifference and conspiracy to violate Mr. Garrett's constitutional rights, Mr. Garrett's constitutional rights were violated, including but not limited to several detectives withholding exculpatory evidence, fabricating evidence, and failing to intervene, each of which individually and collectively caused Mr. Garrett to suffer the serious and incalculable losses and damages generally described herein.

256. Each of said Defendants' unconstitutional acts and/or omissions generally described herein was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by Paul Garrett for which he seeks recovery herein pursuant to applicable law.

**State Law Claims**
**Count VIII: Intentional Infliction of Emotional Distress**
**(Against Defendants Dunaway and Bernard)**

257. Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

258. Based on their conduct described previously, including but not limited to their conduct referenced generally herein, Defendants Dunaway and Bernard, by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to Paul Garrett, which resulted in substantial and prolonged mental anguish and/or injury to Mr. Garrett.

259. Each of the acts and/or omissions of each of said Defendants was so outrageous that it is not to be tolerated by civilized society.

260. Each of the acts and omissions of each of said Defendants was committed while each such Defendant was acting under color of the office and in the course and scope of his employment with MNPD and in the performance of his official functions.

261. Plaintiff specifically avers that each of said acts and/or omissions was intentional and/or reckless and, accordingly, was of such a nature none of said Defendants is entitled to

44

immunity, whether qualified or absolute, for any such conduct under applicable Tennessee law.

262.    Each of said Defendants' acts and/or omissions was the cause in fact and legal cause of harm, injuries, mental anguish, damages, and losses to Paul Garrett as generally described herein, rendering each of them liable to Plaintiff.

## Count IX: Malicious Prosecution
### (Against Defendants Dunaway, Bernard, and Miller)

263.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

264.    In the manner described above and alleged herein, Defendants Dunaway, Miller, and Bernard knowingly and maliciously initiated, influenced, and/or caused criminal proceedings to be commenced and maintained against Mr. Garrett without probable cause.

265.    Throughout the investigation of the Tharpe murder, including during Mr. Garrett's post-conviction proceedings, Defendants knew that there was not probable cause to prosecute Mr. Garrett.

266.    Throughout the investigation of the Tharpe murder, the above-referenced defendants knew that there was no physical evidence or witnesses linking Mr. Garrett to the crime. Rather, the only "evidence" was Mr. Garrett's "confession," which was fabricated by Detectives Dunaway and Bernard, and the coerced identification by Ms. Swift, which was fabricated by Detectives Dunaway and Miller.  Accordingly, defendants lacked a reasonable belief, based on the evidence available to them, that there was probable cause to arrest and seek the prosecution of Mr. Garrett.

267.    As a result of the defendants' wrongful conduct, Mr. Garrett suffered a deprivation of his liberty and was wrongfully prosecuted and spent 10 years and 4 months of his life incarcerated for a crime he did not commit.

268. The prosecution terminated in Mr. Garrett's favor on August 2, 2021, when the Criminal Court for Davidson County, Tennessee granted Mr. Garrett's Petition for Post-Conviction Relief and rendered his conviction void and vacated it.

269. Each of said Defendants' acts and/or omissions was the cause in fact and legal cause of harm, injuries, mental anguish, damages, and losses to Paul Garrett as generally described herein, rendering each of them liable to Plaintiff for malicious prosecution.

**Count X: GTLA Negligence Claims in the Alternative (Against Metro Nashville)[5]**

270. Plaintiff hereby incorporates by reference each and every paragraph above as if fully set forth in this count.

271. The Individual Defendants were, at all relevant times, employees of Defendant Metro Nashville and/or MNPD. None of the Defendants are healthcare facilities.

272. Each of the acts and omissions of the Individual Defendants referenced herein occurred in the course and scope of their employment with Metro Nashville and in the performance of their official functions.

273. The several instances of the MNPD Individual Defendants' misconduct described generally herein does not fall within the exceptions to the removal of immunity set forth in Tenn.

---

[5] Plaintiff notes that there is a split of authority regarding the circumstances when a Plaintiff may plead in the alternative claims that sound in negligence against a municipality under the GTLA, T.C.A. 29-20-201 *et seq.*, in an action asserting primarily civil rights violations under 18 U.S.C. § 1983. Plaintiff asserts negligence claims in the alternative in this count and in Count XI to preserve these claims in accordance with prior consistent authority while recognizing that there is also authority to the contrary, though in cases which Plaintiff contends are factually distinguishable. The right to assert alternative negligence claims is particularly – and uniquely – important given the facts of this case where several different detectives of the Metro Nashville Police Department – with varying experience and authority levels – were, at various times, individually and jointly engaged in numerous separate wrongful acts and omissions which severely and ultimately caused Mr. Garrett to be unconstitutionally arrested, charged, and conviction of the murder of Ms. Tharpe.

46

Code Ann. 29-20-205.

274.    Each of the Individual Defendants had duties to the general public, including to protect and serve the general public in a lawful manner, and these duties extended to individuals such as Mr. Garrett.

275.    As Plaintiff has asserted in detail previously, Plaintiff principally contends that each of the acts of each of the MNPD Individual Defendants was intentional, reckless and/or unconstitutional (and not merely negligent). In the alternative, however, Plaintiff asserts that one or more of the acts and/or omissions of each of said individual defendants referenced in prior counts – where the individual act or omission itself consisted only of improperly failing to intervene and protect Paul Shane Garrett from wrongful or illegal conduct – was negligent.

276.    In any such event (as described in the preceding paragraph), Plaintiff asserts that any such negligent act or omission should be considered separately, distinctly, and apart from any other conduct committed otherwise which was in fact intentional, reckless, and/or unconstitutional and a violation of Mr. Garrett's civil rights (which unconstitutional conduct has been previously described in detail).

277.    Accordingly, and specifically with regard to any such negligent act or omission only (and not any separate intentional, reckless, and/or unconstitutional conduct which violated Mr. Garrett's civil rights), Plaintiff asserts that each such negligent act and/or omission was a breach of the duties to Paul Garrett referenced above; was a cause in fact and legal cause of harm, injuries, mental anguish, damages, and losses to Paul Garrett as generally described above, rendering Metro Nashville liable to Plaintiff in accordance with the Governmental Tort Liability Act, Tenn. Code Ann § 29-20-201, *et. seq*.

## Count XI: Individual Negligence Claims in the Alternative
### (Against MNPD Individual Defendants)

278. Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

279. Each of the MNPD Individual Defendants had duties to the general public, including to protect and serve the general public in a lawful manner, and these duties extended to individuals such as Mr. Garrett.

280. As Plaintiff has asserted in detail previously, Plaintiff principally contends that each of the acts of each of the MNPD Individual Defendants was intentional, reckless and/or unconstitutional (and not merely negligent). In the alternative, however, Plaintiff asserts that one or more of the acts and/or omissions of each of said individual defendants referenced in prior counts – where the individual act or omission itself consisted only of improperly failing to intervene to stop wrongful and illegal conduct and/or improperly failing to intervene to protect Paul Shane Garrett from wrongful or illegal conduct – was negligent.

281. In any such event (as described in the preceding paragraphs in this count), Plaintiff asserts that any such negligent act or omission should be considered separately, distinctly, and apart from any other conduct committed otherwise which was in fact intentional, reckless, and/or unconstitutional and a violation of Mr. Garrett's civil rights (which unconstitutional conduct has been previously described in detail).

282. Further, in the event that it is determined, based on the application of the Governmental Tort Liability Act, Tenn. Code Ann § 29-20-201, *et. seq*., that immunity has not been removed for Metro Nashville and, further, that none of the Individual Defendants are immune from any negligent conduct pursuant to said statutes, Plaintiff Paul Garrett asserts that each such negligent act and/or omission was a breach of the duties owed to him referenced above and was a

48

cause in fact and legal cause of harm, injuries, mental anguish, damages, and losses to him as generally described herein; rendering the MNPD Individual Defendant responsible for each such negligent act or omission liable to Plaintiff pursuant to applicable law.

**Count XII: Punitive Damages**
**(Against Defendants Dunaway, Bernard, and Miller)**

283.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

284.    For each of the actions and omissions of Defendant Dunaway, Bernard, and Miller which were intentional, reckless, deliberately indifferent, and/or shocking to the conscience and/or unconstitutional, Plaintiff requests that he be awarded punitive damages in the amount the trier of fact deems appropriate and just in accordance with applicable law.

**DAMAGES AND PRAYER FOR RELIEF**

285.    As a direct and proximate result of the acts and omissions of Defendants, Mr. Garrett's constitutional rights were violated, and he sustained serious and incalculable losses and damages, including losses of his freedom for the 18 years he was wrongfullyconvicted, losing opportunities to bond and build memories with his family, losing the ability to maintain and pursue a career, and suffering from the substantial embarrassment and damage to his reputation for being convicted (wrongfully) of Ms. Tharpe's murder.  Further, Mr. Garrett's family, including his children, have suffered losses and damages as a result of his unconstitutional and wrongful conviction.  The injuries and damages for which Plaintiff seeks compensation from Defendants, both jointly and severally, under both state and federal law include, but are not limited to, the following:

a.    The wrongful incarceration and conviction of Paul Shane Garrett;

b.    Mr. Garrett's emotional pain and suffering;

49

c.      Injury to his reputation;

d.      Losses in the enjoyment of life;

e.      Losses of wages and earning capacity;

f.      Losses of familial consortium and services of Mr. Garrett;

g.      Losses of the right to familial association, society, and companionship with Mr. Garrett;

h.      All other damages for the violation of Mr. Garrett's civil rights allowed under applicable law.

286.    Further, Plaintiff requests that this Honorable Court enter a judgment against

Defendants, jointly and severally, granting or awarding the following relief:

a.      Compensatory damages for the injuries and damages of Paul Shane Garrett described herein in the amount of Eighteen Million dollars ($18,000,000.00);

b.      Punitive damages in an amount to be determined by the jury as fair and reasonable in accordance with applicable law to deter the named individual defendants and others from engaging in similar misconduct;

c.      Attorneys' fees, to the fullest extent allowable by the statutes generally referenced herein and/or the common law applicable to this case, including but not limited to the extent permitted under 42 U.S.C. § 1988 and any other applicable statute;

d.      Statutory and discretionary costs;

e.      Pre- and post- judgment interest; and

f.      All such further relief, both general and specific, to which he may be entitled.

287.    Plaintiff requests that a jury of 12 be impaneled to hear this cause.

Respectfully submitted this 21st day of January, 2022.

By: s/Wayne A. Ritchie II

WAYNE A. RITCHIE II, BPR #013936
STEPHEN ROSS JOHNSON, BPR#022140
SAMANTHA I. ELLIS, BPR #036709
RITCHIE, DAVIES, JOHNSON &
    STOVALL, P.C.
606 West Main Avenue
Post Office Box 1126
Knoxville, Tennessee 37901-1126
Phone: (865) 637-0661
Fax: (865) 524-4623
e-mail: war@rdjs.law
e-mail: sellis@rdjs.law
e-mail: johnson@rdjs.law

By: s/ J. Isaac Sanders

J. Isaac Sanders (BPR # 29372)
William J. Harbison II (BPR # 33330)
Marisa A. Garcia (BPR # 038424)
1201 Demonbreun Street, Suite 1000
Nashville, TN 37213
(615) 244-1713
isanders@nealharwell.com
jharbison@nealharwell.com
mgarcia@nealharwell.com

***Attorneys for Plaintiff Paul Garrett***